UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                            CASE NO. 8:80-cv-849-T-23TGW

PINELLAS COUNTY FLORIDA,
et al.,

    Defendants.
_____/

## **ORDER**

The United States' complaint was filed on July 24, 1980.[*] Only one week earlier, the Republican Party had nominated Ronald Reagan for president, and only three weeks later the Democratic Party would nominate then-President Carter for a second term. The military of the now-defunct and unlamented Soviet Union was the unfortunate force then resigned to the sempiternal war in Afghanistan.

Featuring the signatures (in 1980, still pen and ink) of Attorney General Benjamin Civiletti and Assistant Attorney General Drew H. Days, III, the original

---

    [*] Compared to other civil litigation on the active docket in the Middle District of Florida, this action is a startling antiquity. The National Archives and Records Administration and the Federal Records Center confirm the December 2011 destruction — under the records disposition agreement between the Administrative Office of the United States Courts and NARA — of the original file, which pre-dates the present electronic docket. In response to a recent order (Doc. 40), the parties submitted a partially re-constituted record, available at Doc. 41.

complaint sues Pinellas County, Florida; the five County Commissioners of Pinellas County; the Chairman of the Personnel Board of Pinellas County; William T. Roberts, the Sheriff of Pinellas County; Sanford Jasper, the Tax Collector of Pinellas County; and even Fred Marquis, the Interim County Administrator. The complaint alleges that the defendants had violated a formidable array of federal statutes and infringed sundry constitutional rights:

> This action is brought by the Attorney General on behalf of the United States of America to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e *et seq.*; the State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. § 1221 *et seq.*; the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3766(c)(1), *et seq.*, as amended (Public Law No. 90-351, as amended by Public Law No. 91-644,, Public Law No. 93-83, Public Law No. 93-415, Public Law No. 94-430 and Public Law No. 94-503); and for the purposes of protecting and enforcing rights guaranteed by the Fourteenth Amendment to the Constitution of the United States.

(Doc. 41-1 at pg. 1, ¶ 1) With an alacrity that evidences some untold tale lurking behind these opaque proceedings, the County Attorney on the same day — July 24, 1980 — answered on behalf of all defendants (apparently no service of process occurred and no conflict of interest was detected among the defendants, each of whom was represented by the Pinellas County attorney).

About a month later, the parties stipulated to an amended complaint, designed by the plaintiffs "to give this court jurisdiction over all of the persons who have agreed to the Consent Agreement in settlement of this action." The amended complaint joined the Personnel Director, the Pinellas County Personnel Board, the Clerk of the Circuit Court, the Property Appraiser, and the Supervisor of Elections.

Like the original complaint, the amended complaint alleges that the defendants (the allegations are directed collectively at "the defendants") "discriminate against women, Spanish-surnamed Americans and blacks with respect to recruitment, hiring, assignment, and promotional opportunities within all the agencies and departments of Pinellas County." (Doc. 41-5 at 5, ¶ 17) Further, the amended complaint alleges that after an investigation, conducted with notice to the defendants, the United States discovered that "[t]he defendants and their officials have failed and refused to eliminate the effects of their past discriminatory policies and practices" and that "[u]nless restrained by order of this Court, the defendants and their officials will continue to pursue policies and practices the same as or similar to those alleged in this complaint." (Doc. 41-5 at 5, ¶ 20)

Soon after the amended complaint, Judge Wm. Terrell Hodges conducted a "status conference" at least in part because a review of the parties' submissions prompted a question about "whether, in the absence of a judicial determination of past discrimination, present employees of the Defendant County who are directly affected as a class by the provisions of the [parties' proposed consent] agreement, should be given notice and an opportunity to be heard." (Doc. 41-7, Att. G, at 1) Judge Hodges ordered the parties to brief the question.

Instead of submitting briefs directed to the question Judge Hodges identified, the parties submitted a stipulated consent agreement (Doc. 41-8, Att. H) that, among other changes, amended the proposed consent agreement to "reserve" the question of

"job classification" and certain "promotional issues." The plaintiff and the defendants each submitted a brief (Doc. 41-9, Att. I, and Doc. 41-10, Att. J, respectively) in support of adoption of the modified consent agreement. The plaintiff's brief included citations to authority and legal argument, but the defendants' brief comprised three paragraphs, only one of which, the second paragraph, comprising one sentence, stated anything substantive:

> The Defendants deny that they have violated any law and reemphasize that the signing of this Consent Agreement does not constitute an admission of any violation of law by any Defendant.

On December 11, 1980, and by an order that notes, "The consent agreement expressly stated, however, that it did not constitute an admission by the Defendants of any violation of law" (Doc. 41-11, Att. K), Judge Hodges approved the amended consent agreement "as an enforceable decree of the Court." The fourteen-page (plus exhibits) consent agreement includes in paragraph 4 a specific statement of objectives:

> The Defendants shall as a long range goal seek to recruit, hire, assign, and promote blacks, Spanish-surnamed Americans, and women in sufficient numbers so that ultimately their composition in each job classification, except as otherwise noted in the paragraphs below, shall be eleven percent (11%) black, two percent (2%) Spanish-surnamed American, and twenty-five percent (25%) female in traditionally non-female job classifications as defined in paragraph 10 of this Consent Agreement. These ultimate goals shall be modified by agreement of the parties, if appropriate, to reflect changes in the 1980 civilian labor force census figures if this Consent Agreement is still in effect when such figures become available.

The consent agreement remained in effect when the 1980 figures became available, but the record reveals no effort — then or now — to effect the agreed "modification"

- 4 -

mentioned in paragraph 4. Apparently, neither party proposed anything — then or now.

The core of the present dispute resides in paragraphs 20 and 21 of the consent agreement, the paragraphs that govern "records" and that require the retention of certain records by the Sheriff and the disclosure of those records on DOJ's request, if requested "not so frequently as to be burdensome":

> 20. The Defendants shall retain during the period of this Consent Agreement all records relating to the recruitment, selection, promotion and training of applicants and employees, which shall be identifiable by race and sex, including applications, which shall be made available to the Department of Justice for inspection and copying upon written request. In addition, the Defendants shall provide the Department of Justice with copies of records and written reports upon written request by the Department, provided that such requests shall not be made so frequently as to be burdensome.
>
> 21. The Defendants shall maintain the following records which shall be provided to the Department of Justice semi-annually, beginning on June 1, 1981, for the six-month period ending April 30, 1980.
>
>> (a) A chart indicating by department and by job classification the total number of employees by race, sex and national origin.
>>
>> (b) A report of all newly hired employees by job classification and Department indicating the name, race, sex, national origin and job classification of each person hired since the last report was filed. . . . .
>>
>> (c) A report of all promotions to vacancies giving the name, race, sex, national origin and date of hire of the employee promoted and the date of the promotion for each job classification. . . . .
>>
>> (d) A list of all persons, by job classification and Department, to whom hire or promotion has been offered under paragraph 16 supra, of this Agreement and whether or not that offer has been accepted.

(e) A detailed report setting out the identification of any payments to members of the affected class and other persons referred to in paragraph 17 supra.

(f) A list of all written employment tests given by Defendants showing for each employment test the job classification for which the test was given; the number of persons by race, sex and national origin passing the test; and the number by race, sex and national origin hired.

(g) A breakdown of the applicant flow of the Defendants by race, sex and national origin which indicates the number of applicants hired, rejected and pending by race, sex and national origin for each job classification. . . .

(h) A list of all organizations and schools which are contacted pursuant to paragraph 13 . . . .

Paragraph 24 of the consent agreement explicitly states the parties' expectation for the implementation and termination of the consent agreement:

> It is the intent of the parties to achieve the objectives of paragraph 4 within five (5) years of the date of the entry of this Agreement. At anytime after five (5) years subsequent to the entry of this Agreement, or earlier if at such time the long-term objectives have been achieved by any of the Defendants, said Defendant may move the Court upon forty-five (45) days notice to the Department of Justice for dissolution of this Consent Agreement with respect to that Defendant. In considering whether the Consent Agreement should be dissolved, the Court will take into account whether the basic objectives of this agreement have been achieved.

The docket remained empty for thirty-three years, from February 20, 1981, until May 29, 2014, when the parties moved (Doc. 18) "for an order partially dissolving the Consent Agreement . . . to release from the Agreement Pinellas County, its officials, and its hiring authorities," except for the Sheriff of Pinellas County, who "would continue to be bound by the terms of the Agreement." The

motion states that after an investigation the "United States has determined that the alleged pattern-or-practice violations of Title VII by Pinellas County that the Agreement sought to remedy have been addressed to the extent practicable" and that "Pinellas County has cooperated in good faith with information requests sent by the United States . . . ."

After a hearing, the magistrate judge recommended (Doc. 26) granting the motion and dissolving the agreement "as it relates to Pinellas County," except for the Sheriff. The magistrate judge's report (Doc. 26 at 2) notes that the Sheriff "objects to the statement that it will remain bound to the consent agreement." Without objection by the plaintiff or the defendants, the partial dissolution was granted on July 16, 2014, "as it relates to Pinellas County." The action was again administratively closed. (Doc. 27)

On January 5, 2015, the United States sent to the Sheriff a "Request for Information" (Doc. 29-15), which the United States designated an "RFI" and which comprised twenty-two separately numbered paragraphs (although paragraph 7 includes eight subparagraphs) describing the information that the United States requested. (The consent decree contains only eight paragraphs [Doc. 17-2 at pp. 11–12] describing the information the Sheriff must retain and disclose.)

Additionally, claiming that "the spirit of the Consent Agreement . . . supports such communication," the United States in the January 5, 2015 letter requests to "speak with PCSO personnel with knowledge of particular policies and practices not

only to learn additional information, but also to explain in more detail our concerns and provide the PCSO an opportunity to address those concerns." The consent agreement includes nothing about permitting the United States to directly interview the Sheriff's employees.

Further, the United States' January 5, 2015 letter states that, although paragraph 21 of the consent agreement requires the Sheriff to provide specified records semi-annually, "according to [the United States'] records, the PCSO has not submitted such reports since 2008 . . . therefore, we are seeking some of this missing information through the RFIs below." Another letter (Doc. 29-19 at Exhibit R) from the United States on February 5, 2015, further presses and elaborates the same request.

On March 11, 2015, the Sheriff responded (Doc. 29-20) with a thirty-two page memorandum that explains the status of his work force and hiring practices and that emphasizes the distinction between detention and law enforcement deputies. On May 21, 2015, the United States replied with a nine-page letter (Doc. 29-6) that contains a litany of objections to the form and content of the Sheriff's disclosure of information, that requests an array of additional information, and that begins with a paragraph that illustrates the sharp deterioration in relations between the United States and the Sheriff:

> We have received the Pinellas County Sheriff's Office's ("PCSO's") March 11, 2015 production in response to our January 5, 2015 Requests for Information ("RFIs"). The PCSO's narrative and

- 8 -

> document production do not respond, in part or at all, to many of the
> RFIs; therefore, we are writing to request that the PCSO complete,
> amend and/or clarify its responses, as indicated below. The PCSO is
> incorrect in its March 11, 2015 description of the issues that the United
> States has raised in prior conversations, e-mails and formal
> correspondence. Regardless, the PCSO has an obligation to respond to
> requests made pursuant to Paragraph 20 of the Agreement and to
> comply with its reporting obligations under Paragraph 21 of the
> Agreement. The United States welcomes narrative responses, where
> appropriate and potentially more helpful, but again, the narrative must
> provide the information sought by the RFIs in question.

Although the Sheriff provided additional information (Doc. 29-24) later in the year, the United States and the Sheriff remained at an impasse on the meaning of, and the continuing vitality of, the consent agreement; the status of the Sheriff's work force and hiring practices; and the sufficiency of the Sheriff's response to requests for information. The United States' December 30, 2015 response to the Sheriff's September 2015 transmittal of additional workforce data concludes:

> If the PCSO does not provide adequate responses to our January 5,
> 2015 RFIs, as outlined in our May 21, 2015 deficiency letter (with the
> exception of RFIs 2 and 20), we will file with the Court appropriate
> papers to enforce the terms of the Agreement. Please provide the
> requested information by January 30, 2016, or state why this deadline
> cannot be met.

On March 18, 2016, the Sheriff defended the sufficiency of his earlier disclosures of information but renewed his objection to what the Sheriff perceived as the United States' escalating requests for information outside the bounds of the consent agreement and the United States attempt to convert the records retention and disclosure requirements of the consent agreement into an amorphous form of

perpetual and unbounded discovery, including "DOJ's request for explanations, clarifications, interrogatories, and interviews." (Doc. 29-25 at 233)

*****************************************

As explained earlier, the docket in this action contains nothing for thirty-three years — from February 20, 1981 until May 29, 2014. Fourteen entries appear during May, June, and July of 2014, as a result of which the consent agreement was dissolved by stipulation as to each Pinellas County defendant, except the Sheriff.

But the unquiet corpse of this action stirred again on November 9, 2016, the day after the presidential election of 2016. On November 9, 2016, stating that the Sheriff "flatly refuses" to comply with the consent agreement, the United States moved (Doc. 28) to re-open the case and moved (Doc. 29) for an order requiring the Sheriff to show cause why the court should not find the Sheriff in contempt. The motion alleges that paragraphs 20 and 21 of the consent agreement "obligate [the Sheriff] to maintain particular records and to report information to the United States, both proactively and in response to the United States' requests for documents" but that "in defiance of these paragraphs" the Sheriff "has refused to respond, in part or in whole, to many of the United States January 5, 2015 document requests." (Doc. 29 at 1–2) The United States' motion includes a lengthy history of the parties' intermittent but difficult relations. The narrative is unverified, either by affidavit or otherwise, and contested.

On May 15, 2017, the Sheriff responded (Doc. 32) that "[o]ver the years, [the] Sheriff has provided the records and documentation the United States has requested" in the RFIs but that, "although these RFIs clearly indicate it was a request for documents, the overwhelming majority of these 22 (excluding subparts) RFIs were questions and requests for explanations, clarifications, analysis, and descriptions of Sheriff's selection, hiring, recruitment, and policies and procedures." (Doc. 32 at 4) Further, in the response, the Sheriff insists that "nearly every single 'deficiency' [about which the United States complains] was a request for clarifications, descriptions, dates, processes, and explanations." Finally, the Sheriff concludes that the records about the "non-sworn workforce" were "uneventful and easily understood by the United States" but that the records about the "sworn workforce," that is, the "hiring of law enforcement deputies and detention deputies," were a source of dispute between the parties.

Acknowledging "the threshold question of the continued vitality of the consent decree after more than thirty-five years of inactivity," a May 18, 2017 order re-opens the action "only to the extent that the Sheriff may move . . . to dissolve the consent agreement, and the United States may respond within fourteen days after the Sheriff's motion." (Doc. 33) On June 9, 2017, the Sheriff moved (Doc. 34) to dissolve the consent agreement, the United States responded (Doc. 36), and the Sheriff replied (Doc. 36). On September 12, 2018, a hearing occurred at which counsel for the

- 11 -

United States, Candyce Phoenix, and counsel for the Sheriff, Shannon Lockheart, appeared and argued.

*****************************************

Through his counsel, Ms. Lockheart, at the hearing the Sheriff confirmed that some exchange of information has occurred "throughout the past 38 years on and off." However, the content, frequency, and thoroughness of these irregular disclosures over the years is uncertain because from 1980, when the consent agreement was entered, until 1989, the Sheriff was part of a "unified personnel system" that conducted the disclosure, if any, to the DOJ, for all the Pinellas County defendants. Apparently, a 1989 civil service act created an office of human rights, to which the Sheriff submitted records and which in concert with the county attorney submitted records to DOJ. Although aware of the documents sent to the office of human rights, the Sheriff cannot identify the records disclosed to DOJ. In 2010, the Sheriff became separately represented by counsel and assumed the direct disclosure of documents to DOJ. Ms. Lockheart claims confidently (and, apparently, correctly), "I can tell you exactly what was sent to DOJ — when, where, and how — since 2011."

However, Ms. Lockheart confirms that the documents produced to DOJ are "not even close" to the same each year because the requests from DOJ — outside the "four corners" of the consent agreement — differ from year to year as "the manner in which the Department of Justice would like to conduct their review has changed or

- 12 -

evolved." Ms. Lockheart confirms that the documents and other matter provided to DOJ are different from, and exceed, the disclosure required by the consent agreement. Ms. Lockheart described the disclosure as follows:

> The department would request, they would say we want to work towards dissolution, give us XYZ so we can dissolve this. And the county would give them certain records and then DOJ would ask us for our records that matched that and we would say that we don't have equivalent records that would cause issues. And then it would be, well, give us — and it was this on-going dialogue. Well, then we want this, we want that, then we need a meeting, then we need a phone conference, so it was years of requests by DOJ and responses by the Sheriff's office.

Ms. Lockheart explains as follows the conclusion of the Sheriff's co-operation with DOJ:

> [B]etween the public records laws and the open book and just the benefit to everybody, nobody wanted to be in Court today on this 1980 decree. It was in everybody's benefit to give them everything we had. Where we drew the line was when they were asking us to create documents, to create flow charts in the manner that we would do it. It took time and personnel and was subject — it was a disaster, but we did it. And then we gave it to them and they didn't like it so they wanted it a different way. Then we gave it to them their different way and they didn't understand it. So then they wanted to have these meetings — or these phone conferences and talk directly to the personnel involved.
>
> And so that's when we said, no, we will give you whatever documents you want but we are not going to have you interview our people and try to figure out what you don't know. If you have a question, ask it. If the question — even recently, I answered whatever direct questions are put . . . .

When asked "[H]as the course of conduct between the parties given the [consent] agreement an ongoing vitality," Ms. Lockheart on behalf of the Sheriff

candidly stated, "I would answer that 'Yes'." In explanation, Ms. Lockheart offered that:

> I could find no significant lag over 38 years where, you know, four or more years went by or five years where there wasn't some sort of discussion, correspondence, evaluation of — of insert whatever they chose to focus on. . . . But I would have to concede to this Court that the Sheriff's office was a willing participant and would give DOJ pretty much whatever they asked until six or seven years ago. Just because it became too much and we couldn't please them. We couldn't give them what they wanted and the less we gave them the more they wanted and the more contentious it became and the more threatening . . . ."

Ms. Phoenix began her presentation for DOJ by adopting Ms. Lockheart's presentation of the parties' course of conduct under the current agreement:

> I can say that we have pretty much [the] same position that Pinellas County Sheriff's office has with regard to the time gap question that you had. Unfortunately we do not have a robust encyclopedic record of everything that was exchanged from 1980 to the present, but I believe counsel characterized it as there was no longstanding gap in the record where there was a lack of exchange of information over time and that is consistent with our reading of the record as well.

In response to the suggestion that history shows that for thirty-five years "[DOJ] was trying to keep up with the Sheriff's practices and the sheriff was trying to provide the information that was available, then and now" but that, nonetheless, "the [parties'] relations have drifted far away from the provisions of the consent agreement," Ms. Phoenix responded, "I wouldn't disagree with that characterization, Your Honor." Ms. Phoenix explained that — using the information available under the consent agreement — DOJ could not determine whether the "core principles" of the consent agreement are satisfied, that is, whether artificial impediments to equal employment with the Sheriff were removed.

- 14 -

Speaking for the United States, Ms. Phoenix confirmed that "the United States is certainly anxious to bring this to a close" but that the Sheriff's data was insufficient to permit the necessary evaluation. In fact, this telling exchange occurred:

> THE COURT: So, it seems to me that the way that this is designed, the way that this consent agreement is designed is to permit the — to require the sheriff to disclose semi annually data sufficient to allow the Department of Justice to determine within a reasonable time whether it was satisfied with the progress, perhaps it might have been, or the goals that were set were actually achieved or if they were not achieved, if they were not achieved for some neutral reason. But the opportunity to make that determination is long long long past and it seems to me that I'm mightily disadvantaged in this — in this circumstance.
>
> I have 35 years of neither one of you complying with this agreement in any meaningful sense. I'm not criticizing or saying that anything you did was unreasonable given the day of the week and the time. You were just trying to move along and you were trying to keep up with their — the department was trying to keep up with the sheriff's practices and the sheriff was trying to provide the information that was available then and now and the relations have drifted far away from the provisions of the consent agreement.
>
> MS. PHOENIX: I wouldn't disagree with that characterization, Your Honor. I think the problem for the United States is that the prevailing case law says in order to dissolve a consent agreement you have to look at whether or not the core principals have been met and there is no way for us to do that without getting the information that we have asked for in confirming that in 2018 these barriers that were identified in 1980 aren't still an issue. That's unfortunately where we are. I think we are all a little handicapped in that sense that we wish we had better data back then, we wish it had been resolved a long time ago and in fact that was what brought the United States to Court in this matter to begin with because we weren't making an effort as evidenced by the 2014 dissolution for the rest of the country to try to figure this out and end the agreement because we recognize it's dragged on

|  |  |
|---|---|
|  | for too long but we can't just do that because of the passage of time and we can't just do that based on, you know, superficial numbers that we get from the county — from the Sheriff's office that don't actually help us answer the question — |
| THE COURT: | You can't — but the only — the only thing you are entitled to under the consent agreement — you may or may not be able to make some determination that you want to make based upon what you can get under the consent agreement but that doesn't mean you have to expand the consent agreement. |

A fair interpretation of the statements by the parties' respective attorneys explains the dilemma presented by the present circumstance: Although neither party can reliably identify the documents and other information provided by the Sheriff and received by the United States during the thirty-plus-year life of the consent agreement, the United States claims persuasively that the information allowed under the consent agreement will not permit the conclusion at which the United States feels compelled to arrive (as the governing issue is framed in 2019 — but not in 1980). On the other hand, the Sheriff claims persuasively that the information provided to the United States already exceeds the requirements of the consent agreement and that the United States currently asks for analyses and interviews neither specified in nor ever contemplated in the consent agreement. Neither party quarrels with the other's conclusion, but each party persists in wanting something the other has opposed.

A court is not established to determine — without standards and as a matter of first instance — who should get what and what requests or responses are fair or useful. In this instance, the business of the court is to determine whether the consent agreement remains enforceable and meaningful and whether the parties are

complying with the consent agreement. With that objective in mind, I directed

(Doc. 47) the magistrate judge as follows:

> This action is referred to the magistrate judge to determine whether the Sheriff has provided to the United States the information for 2018 identified for disclosure under the consent agreement. If the Sheriff has provided the information for 2018, the magistrate judge should enter an order notifying the district judge that the required disclosure is complete. If the Sheriff has not provided the information required by the consent agreement, the magistrate judge should order with specificity the prompt disclosure of any undisclosed information. When the Sheriff has disclosed the information for 2018 that is required by the consent agreement, the magistrate judge should enter an order notifying the district judge.

The magistrate judge convened the parties to determine what information, if any, was both required by the consent agreement and undisclosed by the Sheriff and what, if anything, the United States demanded that was not required by the consent agreement. The Sheriff asserted that all available documentation required by the consent agreement was provided. The United States agreed, except for "the subparagraphs within paragraph 21" (Doc. 59 at 3), specifically, subparagraphs 21(b), 21(c), and 21(g).

After the hearing, the magistrate judge issued a report and recommendation (Doc. 59) that leads to an obvious, commendable, and final resolution of the current dispute:

> In sum, with respect to 2018, the United States raised objections to the Sheriff's production only under three provisions. At the hearing, the United States indicated that it was no longer pressing objections regarding two of the three provision (¶¶ 21(b), 21(g)). The third provision (¶ 21(c)) concerned promotions, and, as explained, the consent agreement did not require the Sheriff to produce any data about promotions. Thus, the Sheriff's production under the consent agreement for 2018 was not deficient.

> This conclusion is consistent with comments made by the Justice Department attorney at the hearing. The attorney said that, if the Sheriff resubmitted the motion to dissolve the consent agreement, the court could absolutely grant the motion. He indicated that this could be done on such grounds as substantial compliance, or that the consent agreement no longer serves any purpose, or that the passage of time has rendered the agreement obsolete.

(Doc. 59 at 12) Neither the United States nor the Sheriff objects to the report and recommendation.

In response to the invitation from the United States the Sheriff on June 20, 2019, moved (Doc. 60) again to dissolve the consent agreement. The Sheriff's motion remains unopposed. Because, as the United States concedes, the Sheriff has substantially complied with the consent agreement and substantially accomplished the purpose of the consent agreement, the disclosures required by the consent agreement no longer serve any purpose of the United States (or the Sheriff or the public), and the passage of time has rendered obsolete both the consent agreement and the parties' disagreements about the consent agreement, the report and recommendation is **ADOPTED**, the Sheriff's renewed motion (Doc. 60) is **GRANTED**, the consent agreement is **DISSOLVED**, these proceedings are **DISMISSED**, and the clerk must **CLOSE** the case.

ORDERED in Tampa, Florida, on September 30, 2019.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE